IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THOMAS W. GRESHAM       *
                               *
       v.                 *    Civil No. JFM-03-2243
                               *
LUMBERMAN'S MUTUAL     *
CASUALTY CO.             *
                         *****

OPINION

Plaintiff Thomas W. Gresham brought this action against Defendant Lumbermens Mutual Casualty Company ("Kemper") on August 1, 2003, asserting claims for breach of contract and violation of the Maryland Wage Payment and Collection Act ("WPA"), Md. Labor & Employ. Code Ann. § 3-501 *et seq.* After I granted Kemper's motion for summary judgment, the Fourth Circuit reversed, ruling that Gresham was entitled to judgment on his claim for breach of contract and remanding the WPA claim. *Gresham v. Lumberman's Mutual Casualty Co.*, 404 F.3d 253 (4th Cir. 2005). On May 25, 2005, I entered an order awarding Gresham the principal amount of his underlying claim plus accrued interest, totaling $145,236. That judgment has now been satisfied. The only remaining issue is whether under the WPA Gresham should receive attorney's fees and additional damages up to twice the amount of his claim.[1] The parties have filed cross-motions for summary judgment on this question.

I.

Kemper hired Gresham in January 1999 as Vice-President of a new subsidiary responsible for developing a professional liability line of insurance. An offer letter sent to

---

[1] The WPA allows for recovery of treble damages, but in this case Gresham has already received the principal amount. He is only entitled to receive twice that amount in additional damages.

Gresham by Kemper's President and Chief Operating Officer William Smith on Dec. 14, 1998,

served as Gresham's employment agreement.  This letter included a severance provision:

"Severance Protection - One year base salary will be paid if terminated without cause."  (Pl.'s

Opp'n to Def.'s Renewed Mot. for Summ. J. and Pl.'s Cross-Mot. for Summ. J., Ex. B.)  The

agreement included no other language regarding the severance provision.

　　　　During the time of Gresham's hiring and employment, Kemper maintained a severance

plan that was subject to the Employee Retirement Security and Investment Act of 1974

("ERISA") (hereinafter the "ERISA Severance Plan" or "Plan").  Under the terms of this plan,

employees were ineligible for severance if they left before their scheduled termination date or

were offered comparable positions with a purchaser.  Kemper took the position that Gresham's

severance was subject to the conditions set forth in the ERISA Severance Plan, even though the

Plan was not referenced in his employment agreement.

　　　　On May 1, 2003, Kemper provided Gresham with a 60-day notice of his termination.

Kemper's planned termination was not grounded upon any contention that Gresham had

committed an act constituting "cause" but rather upon Kemper's decision to sell its professional

liability line of insurance to another company.  Kemper completed the sale to The St. Paul

Insurance Companies ("The St. Paul") on May 9, 2003.  On May 19, 2003, Kemper received an

e-mail from The St. Paul stating that Gresham had accepted a position with The St. Paul.  At that

point, Kemper removed Gresham from its payroll.  The transition was seamless; Gresham never

missed a day of work and continued to report to the same office.

　　　　When Gresham requested the severance pay described in his employment agreement,

Kemper refused because of Gresham's employment with The St. Paul.   Kemper communicated

its position to Gresham in emails sent on May 9, 2003 and May 19, 2003 from Kemper's Human

Resources Manager to Gresham: The May 9, 2003 email states, in part, "You are not eligible to

receive severance benefits if you accept a position as part of a renewal rights transaction."  The

May 19, 2003 email states, in part:  "Due to your continued employment, no severance benefits

will be paid."  (Def.'s Renewed Mot. For Summ. J., Ex. E).


      Gresham subsequently filed suit.  In defending against the claims, Kemper asserted that

Gresham was not entitled to a severance payment because (1) his contract right to receive such a

payment was preempted by the company's ERISA Severance Plan, (2) the provisions of the

ERISA Severance Plan were implicitly incorporated into his contract, and/or (3)  he left

Kemper's employ prior to his proposed separation date.  I declined to address the ERISA issues

and held that Gresham had been terminated "for cause" when he departed Kemper because "a

corporate executive cannot be simultaneously performing effective services to different

companies at the same time."  The Fourth Circuit reversed this ruling.  The Fourth Circuit also

found that Gresham's contract claim for a severance benefit was not preempted by ERISA and

that under the unambiguous terms of the contract the terms of the ERISA Severance Plan were

not incorporated into the contract.  Accordingly, the Fourth Circuit held that Gresham was

entitled to receive a severance payment and remanded the case to this court for further

proceedings.

## II.

      The WPA protects employees from wrongful withholding of wages by employers upon

termination.  *See generally Stevenson v. Branch Banking & Trust Corp.*, 861. A.2d 735, 743-44

(Md. Ct. Spec. App. 2004) (explaining the purpose of the WPA). Section 3-505 of the WPA provides that each employer shall pay a terminated employee all wages due for work that the employee performed before termination. Md. Labor & Employ. Code Ann. § 3-505. Wages are defined as "all compensation that is due to an employee for employment" and include a bonus, commission, fringe benefit, or "[a]ny other remuneration promised for service." *Id.* § 3-501(c). Section 3-507.1 of the WPA creates a private right of action to recover unpaid wages. *Id.* § 3-507.1(a). If a court finds that an employer withheld owed wages not as a result of a "bona fide dispute," the court may award the employee an amount not exceeding three times the wages, along with reasonable attorney's fees and other costs. *Id.* § 3-507.1(b).

Two questions are presented by Gresham's claim for treble damages and attorney's fees. First, does his severance pay constitutes "wages" within the meaning of the WPA? Second, if severance pay does qualify as wages, did a bona fide dispute exist as to Kemper's responsibility to make the severance payment?

III.

The answer to the first question - whether the severance pay to which plaintiff was entitled constitutes "wages" within the meaning of the WPA - is yes. In *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 672-73 (Md. 2001), the Maryland Court of Appeals stated that "[o]nce a bonus, commission, or fringe benefit has been promised as part of the compensation for service, the employee would be entitled to its enforcement as wages." The following year, summarizing the *Whiting-Turner* test, the Court of Appeals explained: "[i]t is the exchange of the remuneration for the employee's work that is crucial for the determination that compensation constitutes a wage. Where the payments are dependent upon conditions other than

the employee's efforts, they lie outside of the definition." *Medex v. McCabe*, 811 A.2d 297, 301 (Md. 2002). The court further noted that "an employee's right to compensation vests when the employee does everything required to earn the wages." *Id*. at 305. Accordingly, the court held that incentive fees earned during employment constituted wages, and it refused to enforce a contractual provision that required employees still be working for the company at the time the fees were actually paid.

In *Stevenson v. Branch Banking & Trust Corp.*, 861 A.2d 735, 749 (Md. Ct. of Spec. App. 2004), the Court of Special Appeals opined that "a severance benefit that is based upon the length and/or nature of the employee's service and promised upon termination, may be recoverable under the Wage Payment Act." Because the severance benefit in *Stevenson* was tied to a non-compete agreement, the court found that the severance pay did not represent deferred compensation but was a *quid pro quo* for the noncompete agreement. *Id*. at 749-50. In contrast, in the present case the severance payment to which plaintiff was entitled related solely to his satisfactory service during the period of employment. The parties' agreement was that the benefit was to be paid if plaintiff was terminated without cause. Kemper makes no contention that Gresham engaged in any conduct that constituted cause for his discharge. To the contrary, he was a well regarded and highly performing executive. Accordingly, his severance benefit constitutes wages within the meaning of the WPA. *Cf. Provident Bank of Maryland v. McCarthy*, 2005 W.L. 2016923, at *2 (D. Md. Aug. 23, 2005) (finding that an imputed interest payment conditioned in part on the employee's termination without cause qualified as wages under the WPA).

IV.

The second question - whether there was an absence of a bona fide dispute so as to permit Gresham to recover an amount not exceeding three times his wages, plus his reasonable attorney's fees and other costs - is more difficult.  In *Admiral Mortgage, Inc. v. Cooper*, 745 A.2d 1026 (Md. 2000), the Maryland Court of Appeals granted *certiorari* "to examine . . . whether the determination of additional statutory damages, attorneys' fees, and costs under § 3-507.1 is to be made by a judge or, when the plaintiff has sought a jury trial, by the jury." *Id.* at 1032.  The court answered that question by ruling that while "the determination of attorneys' fees and costs is for the judge," "discretionary damages is for the trier of fact [i.e. the jury in a case where a jury trial has been requested] to determine." *Id.* at 1035.  While in *Admiral Mortgage* the court was primarily focusing on who should decide the amount or extent of statutory damages, in *Baltimore Harbor Charters Ltd. v. Ayd*, 780 A.2d 303, 321 (Md. 2001), the court stated more broadly that "[t]he existence of a bona fide dispute under § 3-507.1 is a question of fact left for resolution by the jury, not the trial judge.") However, as in any case, in order for an employee to withstand a summary judgment motion, there must be "sufficient evidence adduced to permit a trier of fact to determine that . . . [the employer] did not act in good faith when it refused to pay . . . ." *Admiral Mortgage*, 745 Md. at 103.

Gresham asserts as his primary position that an objective standard applies to the bona fide dispute question.  Defendant concurs with that proposition but the parties' agreement there ends.  Gresham argues that because the Fourth Circuit ruled in his favor on the three governing issues (no ERISA preemption, no incorporation of the terms of Kemper's ERISA plan into his individual contract, and no cause for termination by virtue of his having begun work with The St. Paul before the date on which his employment with Kemper ended), there was no objective basis

for Kemper's decision not pay him his severance benefit.  According to Gresham, he is therefore entitled to summary judgment under § 3-507.1, at least as to the issue of liability.  Kemper, on the other hand, contends that the legal defenses it raised themselves establish the existence of a bona fide dispute concerning Gresham's right to receive severance pay, thereby entitling it to summary judgment under § 3-507.1.

I find Kemper's argument under an objective standard to be persuasive.  Of course, if an employer were to assert an insubstantial legal defense to a wage claim, the assertion of the defense would not establish that a bona fide dispute existed between the parties.  However, Kemper's defenses that Gresham's individual contract was preempted by Kemper's ERISA Severance Plan or that the terms of the Plan were implicitly incorporated into Gresham's contract were not insubstantial.[2]  The Fourth Circuit did not summarily reject them.  Rather, it wrote a somewhat extensive thirteen page published opinion in which, *inter alia*, it noted that one of its prior decisions, *Stiltner v. Beretta U. S. A. Corp.*, 74 F.3d 1473 (4th Cir.)(en banc) contained arguably contrary dictum on the ERISA preemption issue.  *Gresham*, 404 F.3d at 259.

Gresham argues in his reply memorandum that even if there was an objectively reasonable basis for Kemper's decision not to pay him his severance benefit, there is sufficient evidence of Kemper's subjective bad faith to entitle him to have the case submitted to a  jury to decide whether a bona fide dispute existed and, if not, the amount of multiplied damages to

---

[2]I am not addressing whether the "termination for cause" ground upon which I ruled in Kemper's favor was insubstantial because (1) that was not a basis contemporaneously articulated by Kemper when it decided not to pay Gresham a severance benefit, and (2) it would be somewhat unseemly for me to evaluate the quality of my own reasoning which the Fourth Circuit found to be unpersuasive.  I note only that I found the ERISA questions to be sufficiently difficult that I sidestepped them by basing my decision on a different ground.

which he is entitled.  As a threshold matter, I find that Gresham's initial position is correct that

an objective, rather than a subjective, standard applies.  If the legal position taken by a party is

objectively reasonable, its motive for taking the position is, in my judgment, immaterial.  In any

event, I also find that the three pieces of evidence upon which Gresham relies to support his

allegation of Kemper's subjective bad faith are not sufficient to create a triable issue.

First, he cites the testimony of Reina Gregorio, the president of the professional liability

line who hired Gresham, that her "assumption would have been that if his [Gresham's]

employment with the company was terminated for any reason other than cause he would have

gotten his severance."  Gregorio Dep., at 21.  Gregorio further testified that she "felt that whether

they [Gresham and other people she had recruited] got employment offers from the acquiring

company or not was not particularly relevant, that Kemper should honor their commitments to

these individuals under the terms of their employment letters."  *Id.* at 24.  Her views stemmed

from her perception that a substantial severance package had been necessary to hire high-quality

people in the professional liability line "because it was a start-up and it was a risk associated

with a start-up organization . . . ."  *Id.* at 161.

Gregorio's testimony is the strongest evidence Gresham has to support his position.  It is

not, however, sufficient to establish that Kemper did not have bona fide grounds for its decision.

As a manager, Gregorio understandably (and commendably) was loyal to the people in her

group.  However, she did not have the perspective of those charged with uniform application of

company-wide policy, and she was not responsible for the decision not to pay severance benefits

to Gresham and others who received comparable offers from The St. Paul.  Indeed, Gregorio's

testimony tends to show that Kemper acted in good faith.  She said that Bob Lineman, a member

of Kemper's executive management board, told her that the board had discussed the severance

issue with Kemper's general counsel's office and decided that Kemper executives who received

offers with acquiring companies would not receive severance payments. *Id.* at 23. Although

Gregorio does not recall what the stated justification for this position was, *id*. at 25, her account

shows that Kemper management officials reviewed the matter with the company's lawyers

before making their decision. Moreover, her testimony corroborates that the decision was based

upon the view, consistently maintained by Kemper, that Gresham's right to a severance payment

was governed by the ERISA Severance Plan. In the latter regard, there is nothing in the record

to suggest that Gresham was treated any differently from anyone similarly situated to him. No

one who received a comparable offer from The St. Paul received a severance benefit. *Compare*

*Admiral Mortgage*, 745 A.2d at 1031 (commissions not paid to plaintiff were paid to a similarly

situated employee who had left the company).

Second, Gresham relies upon the testimony of Craig Richards, the headhunter who

assisted Kemper in recruiting Gresham, that he believed that Gresham was entitled to receive

severance pay unless he was terminated for acts conventionally understood to constitute "cause"

such as "fraud, embezzlement, being arrested and convicted of a crime, maybe repeated

insubordination after multiple warnings." Richards Dep., at 9. Richards' understanding of

Gresham's contract rights is completely immaterial because the record is clear he had no

authority to speak for Kemper, interpret its contracts with its employees, or explain the

relationship between those contracts and the company's ERISA plans.[3]

---

[3]Richards did testify about a conversation he had with William D. Smith, Kemper's
President and Chief Operating Officer, in which Smith confirmed that he shared Richards'
understanding of the term "cause." Assuming (as, of course, one must in considering

Third, Gresham suggests that the evidence shows that Kemper was motivated by "greed" in its dealings with him because, as he learned during the course of discovery, under a provision of Kemper's agreement with The St. Paul, Kemper was required to pay $833,333 back to The St. Paul if Gresham did not accept a job offer from The St. Paul.  According to Gresham, Kemper "knew that a working man who was the sole support for a wife and several children would try to avoid any period of time without a paycheck" and that this provided a motive to Kemper to refuse his severance payment.

Gresham's contention is speculative and unsupported by any evidence (or reasonable inferences from any evidence) in the record.  No testimony or documentation reflects that Kemper considered Gresham's alleged vulnerability in making its decision, and the fact that Kemper treated all employees who received offers from The St. Paul the same weights against the allegation that Kemper singled Gresham out for unfavorable treatment because of the payback position in the acquisition agreement.  Moreover, Gresham's implication that Kemper took advantage of an unfair bargaining position over a powerless "working man" is contradicted by the facts that (1) Gresham cut a special deal when he was hired by Kemper  giving him a better severance benefit than the one available to Kemper's regular employees covered by the company's ERISA Severance Plan, and (2) Gresham likewise negotiated with The St. Paul to improve the compensation package originally offered to him at the time of the acquisition.

---

defendant's summary judgment motion) that Smith said what Richards avers, the statement is irrelevant because it does not negate Kemper's articulated position that the question of "cause" aside, Gresham's right to a severance benefit was governed by the terms of the ERISA severance plan.  Richards also testified that Smith never told him that Gresham would not receive a severance payment if Gresham received a comparable offer from an acquiring company. However, Richards did not give any testimony indicating that the question was ever raised in his conversations with Smith.  Thus, Smith's silence cannot be deemed to be an admission.

Finally, if Kemper's primary concern was, as asserted by Gresham, to save the $833,333 it would have to pay back to The St. Paul if Gresham did not join The St. Paul, it is at least as arguable that Kemper would have made the severance payment to Gresham in order to maintain good will and entice him to accept The St. Paul's offer.  From that perspective, the fact that it did not do so but instead treated Gresham as it did all other similarly situated employees tends to show its good faith.  In any event, Kemper's position was consistent throughout.  *Compare Admiral Mortgage,* 745 A.2d at 1031 (a token commission payment was made that was not consistent with refusal to pay other commissions); *Baltimore Harbor Charters*, 780 A.2d at 321-22 (employer conceded that a portion of the claimed wages were improperly withheld).

In sum, I find that applying an objective standard a bona fide dispute existed as to whether Gresham was entitled to receive a severance payment.  I also find that assuming Kemper's subjective intentions and motivations are a proper subject of inquiry under the WPA, there is insufficient evidence in the summary judgment record to entitle Kemper to proceed to trial on the question of Kemper's alleged bad faith.

## V.

Let me finally note that I am ruling in defendant's favor with some reluctance.

First, I do not want it to appear that my present ruling is colored in any way by the fact the Fourth Circuit reversed my prior decision in this case.  Of course, whether or not I agree with the conclusion the Fourth Circuit reaches on an appeal from a ruling I have made, I  fully respect the court's higher authority in the judicial hierarchy.  Here, however, my respect for the Fourth Circuit's opinion is not merely formal;  I  have come to the view that the court was correct in reversing my prior decision on the underlying question of Gresham's entitlement to a severance

benefit.

Second, although Gresham has not raised the issue, he might reasonably contend that the Fourth Circuit implicitly ruled he has a viable claim under § 3-507.1 simply by virtue of the fact that it remanded the case for further proceedings in connection with his WPA claim.  Strictly as a matter of logic, it could be said  there would have been no need for further proceedings on remand (other than the entry of judgment) if the Fourth Circuit did not believe that Gresham has a viable claim under § 3-507; its reversal of my ruling on the contract claim itself entitled Gresham to the unmultiplied amount of his severance pay.  However, I believe that the Fourth Circuit would have expressly stated its view if it had concluded that Kemper had no "bona fide dispute" defense under § 3-507.1, and I read its opinion only as directing me to take a fresh look at the WPA issues.

Third, Gresham asserts, and defendant does not deny, that defendant is now in financial straits and that unless his claim under the WPA is resolved quickly, it may as a practical matter be lost. Therefore, Gresham requests that if I have doubts about the viability of the claim, I should nevertheless permit the case to proceed to trial and grant defendant's post-trial motion for judgment as a matter of law in the event the jury returns a verdict I believe to be legally unsustainable.  Judges should not be deaf to pleas that justice delayed may be justice denied. However, in this instance I have concluded I cannot grant Gresham's request.  I believe that the question of whether a bona fide dispute existed between the parties cannot be resolved without an assessment of the merits of the reasons Kemper refused to make a severance payment to Gresham, and I do not see how a jury can be asked to make that assessment.  Thus, in my view, as the issues now stand any trial on Gresham's WPA claim would be inherently flawed and itself

would constitute an injustice.[4]

     A separate order is being entered herewith.


Date: November 10, 2005       /s/_____

                                         J. Frederick Motz
                                         United States District Judge

---

[4]Because of what appears to be defendant's precarious financial position, the Fourth Circuit should perhaps consider, if Gresham requests, that any appeal of my rulings be expedited.